RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0092p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

SHAWN NORTHRUP,

        *Plaintiff-Appellee*,

   *v.*

CITY OF TOLEDO POLICE DEPARTMENT; DAVID R. BRIGHT; DANIEL RAY,

        *Defendants-Appellants*.

No. 14-4050

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:12-cv-01544—Jeffrey James Helmick, District Judge.

Decided and Filed:  May 13, 2015

Before: GILMAN, ROGERS, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** John T. Madigan, CITY OF TOLEDO DEPARTMENT OF LAW, Toledo, Ohio, for Appellants.  Daniel T. Ellis, LYDY & MOAN, LTD., Sylvania, Ohio, for Appellee.

_____

**OPINION**

_____

    SUTTON, Circuit Judge.  On a midsummer evening, Shawn and Denise Northrup went for a neighborhood walk with their daughter, grandson, and dog.  Apparently in a happy-go-lucky mood, Shawn wore a t-shirt reading, "This Is The Shirt I Wear When I Don't Care."  R. 28 at 7–8.  Shawn carried a cell phone, which he holstered on his hip—next to a black semiautomatic handgun.

A passing motorcyclist stopped to complain about Shawn's visible firearm. The stranger, Alan Rose, yelled, "[Y]ou can't walk around with a gun like that!" But "[O]pen carry is legal in Ohio!" Denise responded. *Id.* at 28. As the Northrups walked away, Denise and Rose exchanged increasingly unprintable words until he was out of view (and earshot).

Rose called 911, reporting that "a guy walking down the street" with his dog was "carrying a gun out in the open." R. 39 at 22–23. When asked what type of gun the guy was carrying, Rose replied, "A handgun, and he's telling me it's legal to carry out in the open." *Id.* at 23. That's right, the dispatcher responded, it's legal "[i]f you have a CCW"—a concealed-carry weapon permit. "I'll get a crew out though." *Id.* The legality of Northrup's behavior threw Rose for a loop, prompting him to add: "I'm not going to call a crew out if it's legal to carry a gun out in the open." *Id.*

Despite Rose's change of heart, the dispatcher sent an officer to the scene anyway. "I'm not an officer," she worried. *Id.* She dispatched Officer David Bright with the message that someone was "walking his dog on Rochelle [Road] carrying a handgun out in the open." R. 26 at 35, 115. Ten minutes later, Bright spotted the Northrups, their dog, and the "gun on [Shawn's] hip." *Id.* at 36. He got out of his vehicle, said "excuse me, sir," and asked Shawn to hand the dog's leash to his wife, which Shawn did. *Id.* at 37.

At that point, according to Officer Bright, Shawn pulled out his cell phone, then "moved his hands back toward his weapon"—where his cell phone had been—"in what [Officer Bright] believed to be furtive movement." *Id.* Bright asked Shawn to turn around with his hands over his head. *Id.* at 38. Rather than comply, Shawn "kept asking" why Bright was there. *Id.* And rather than answer, Bright "walked up and unsnapped and temporarily took possession of his firearm." *Id.*

Shawn adds these details. Before Officer Bright emerged from his car, Shawn began holding his phone (and leash and arms) out in front of him to record the interaction. Bright walked up with "his hand on his firearm," announced that if Shawn "go[es] for the weapon, he's going to shoot," and refused to answer any of Shawn's questions, such as: "[W]hat was going on?" "[A]m I free to go?" "[A]m I under arrest here?" R. 28 at 33–35. After Bright disarmed Shawn and explained he was responding to a call, Bright demanded Shawn's driver's license and

concealed-carry permit. Shawn gave Bright his license, but Denise told Bright to look up the permit himself, prompting Bright to threaten to "arrest [Shawn] for inducing panic right now." *Id.* at 36.

At that point, Bright placed Shawn in handcuffs and put him in the squad car. Bright suspected Shawn had committed the Ohio offense of "inducing panic." R. 26 at 47; *see* Ohio Rev. Code § 2917.31. After Bright looked up Shawn's driver's license, he discovered that Shawn had a concealed-carry permit—making the family walk (dog, cellphone, gun, and all) legal. After about a half hour and after another officer (Sergeant Daniel Ray) arrived, Officer Bright released Shawn with a citation for "failure to disclose personal information." Ohio Rev. Code § 2921.29(A)(1). The police later dropped that charge.

Shawn Northrup sued Officer Bright, Sergeant Ray, and other members of the Toledo Police Department in federal court, alleging violations of his rights under the First, Second, Fourth (and Fourteenth) Amendments as well as state law. The district court granted the officers' summary judgment motion in part, rejecting Northrup's First and Second Amendment claims as a matter of law. But it permitted his Fourth Amendment and state-law claims against Bright and Ray to go to trial. The officers filed this interlocutory appeal.

Officer Bright claims that he had a "reasonable suspicion" that Northrup was engaged in criminal activity based on two undisputed facts: (1) Northrup was visibly carrying a gun on his holster, and (2) Bright was responding to a 911 call. That reasonable suspicion, Bright claims, justified his disarmament, detention, and citation of Northrup. Before addressing whether he is right, we should mention a few guiding principles.

Qualified immunity protects the officers from this lawsuit if either of two things is true: The officers did not violate Northrup's Fourth Amendment rights, or any such rights were not clearly established at the time of the search. Summary judgment is appropriate if no material fact dispute clouds the officers' defense and if they are entitled to judgment as a matter of law. And the nonmovant—here Northrup—gets the benefit of all reasonable inferences in the record.

The Fourth Amendment protects "the people" from "unreasonable searches and seizures." U.S. Const. amend. IV. The guarantee does not prevent the police from initiating

"consensual encounter[s]" with individuals—from approaching them on public streets and in other public places and asking them questions. *United States v. Drayton*, 536 U.S. 194, 200–01 (2002). But it does prevent the police from stopping and frisking individuals in the absence of "reasonable suspicion" that the individual has committed, or is about to commit, a crime. *Terry v. Ohio*, 392 U.S. 1, 21, 27 (1968). More than an "inchoate and unparticularized suspicion or 'hunch'" is needed to stop and frisk an individual; the officer must identify "specific and articulable facts" of criminality. *Id.* at 27.

The facts of *Terry* make the abstract more concrete. A Cleveland police officer noticed two young men pacing outside a store and closely scrutinizing it. *Id.* at 5–6. Afraid the two men might be planning an armed robbery—"casing" the joint in the Court's words—the officer approached the men, identified himself as a police officer, and asked what they were doing. *Id.* at 6–7. The men were evasive, leading the officer to spin one of the men around and pat down his clothing to check if he was armed. *Id.* He was. The officer found a concealed—and illegal to possess at the time—handgun. *Id.* When the Supreme Court considered the men's argument that this "stop and frisk" amounted to an unreasonable search and seizure, Chief Justice Warren wrote for eight Justices that police officers may reasonably intrude into a pedestrian's personal security if they can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21.

In today's case, Officer Bright relies on two "specific and articulable facts": Northrup's open possession of a firearm and the 911 call about what Northrup was doing. The Fourth Amendment no doubt permitted Bright to approach Northrup and to ask him questions. But that is not what he did. He relied on these facts to stop Northrup, disarm him, and handcuff him. Ohio law permits the open carry of firearms, Ohio Rev. Code § 9.68(C)(1), and thus permitted Northrup to do exactly what he was doing. While the dispatcher and motorcyclist may not have known the details of Ohio's open-carry firearm law, the police officer had no basis for such uncertainty. If it is appropriate to presume that citizens know the parameters of the criminal laws, it is surely appropriate to expect the same of law enforcement officers—at least with regard to unambiguous statutes. *Heien v. North Carolina*, 135 S. Ct. 530, 540 (2014).

Clearly established law required Bright to point to evidence that Northrup may have been "armed *and dangerous.*" *Sibron v. New York*, 392 U.S. 40, 64 (1968) (emphasis added). Yet all he ever saw was that Northrup was armed—and legally so. To allow stops in this setting "would effectively eliminate Fourth Amendment protections for lawfully armed persons." *United States v. King,* 990 F.2d 1552, 1559 (10th Cir. 1993); *accord United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000); *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013); *United States v. Roch*, 5 F.3d 894, 899 (5th Cir. 1993).

This requirement and the impropriety of Officer Bright's demands are particularly acute in a State like Ohio. Not only has the State made open carry of a firearm legal, but it also does not require gun owners to produce or even carry their licenses for inquiring officers. *See* Ohio Rev. Code §§ 9.68(C)(1), 2923.12; Mike DeWine, Ohio Att'y Gen., *Ohio's Concealed Carry Laws and License Application* 15 (2015) ("Ohio's concealed carry laws do not regulate 'open' carry of firearms. If you openly carry, use caution. The open carry of firearms is a legal activity in Ohio."); R. 26 at 121 ("If an officer engages in a conversation with a person who is carrying a gun openly, but otherwise is not committing a crime, the person cannot be required to produce identification.").

What about the verbal dispute between the Northrups and the motorcyclist? Doesn't that justify Bright's suspicion that the Northrups were engaged in criminal activity? No, for at least two reasons. There is no evidence that Bright knew about the dispute: All that the dispatcher told him was there was a man "walking his dog on Rochelle [Road] carrying a handgun out in the open." R. 26 at 35, 115. Even if Bright had known about the argument, the statute that he suspected Northrup of violating—"inducing panic"—does not cover what happened. Under Ohio law, "inducing panic" applies to circulating a false warning of an impending "catastrophe," threatening to commit an "offense of violence," or committing an offense with "reckless disregard of the likelihood" that it will cause "serious public inconvenience or alarm," Ohio Rev. Code § 2917.31. Carrying a handgun out in the open is not an "offense" in Ohio and thus does not fall within any of these proscribed activities.

What about the possibility that Northrup was carrying a firearm not covered by the Ohio law? Had Northrup been carrying a gun that looked like an assault rifle or some other illicit

firearm, that might have justified the officer's conduct. *See Embody v. Ward*, 695 F.3d 577, 580–81 (6th Cir. 2012). But there is no evidence that this was the case, and Bright indeed does not even make this argument.

What about the possibility that Northrup was not licensed to carry a gun or that he was a felon prohibited from possessing a gun? Where it is lawful to possess a firearm, unlawful possession "is not the default status." *Black*, 707 F.3d at 540; *Ubiles*, 224 F.3d at 217. There is no "automatic firearm exception" to the *Terry* rule. *Florida v. J.L.*, 529 U.S. 266, 272 (2000). In *Ublies*, the Third Circuit showed why. There, police responded to an anonymous tip that Ubiles was carrying a gun while attending a crowded street festival in the Virgin Islands—which on its face was a legal activity. 224 F.3d at 214. The police nevertheless detained Ubiles even though they were unaware of "any articulable facts suggesting that the gun Ubiles possessed was defaced or unlicensed, [or] that Ubiles posed a safety risk." *Id.* at 218. In rejecting the officers' argument that Ubiles's possession *might* have been illegal, the court treated the situation as "no different" from a setting in which the officers suspected "that Ubiles possessed a wallet, a perfectly legal act in the Virgin Islands, and the authorities stopped him for this reason. Though a search of that wallet may have revealed counterfeit bills—the possession of which is a crime under United States law—the officers would have had no justification to stop Ubiles based merely on information that he possessed a wallet." *Id.* (citation omitted).

Officer Bright adds that he faced a difficult choice: "[R]espond to the communities' fear and the appearance of the gunman by performing an investigatory stop, or do nothing while Northrup continued walking down Rochelle and hope that he was not about to start shooting." Appellant's Br. 16. Law enforcement, to be sure, is not an easy job, and it often puts officers to difficult choices. But this was not one of them. The argument indeed presents a false dichotomy. Nothing in the Fourth Amendment prohibited Officer Bright from responding to the call and ascertaining through a consensual encounter whether Northrup appeared dangerous. Until any such suspicion emerged, however, Bright's *hope* that Northrup "was not about to start shooting" remains another word for the *trust* that Ohioans have placed in their State's approach to gun licensure and gun possession.

What about Officer Bright's perception that Northrup made a "furtive movement" toward the gun during the encounter? Officer Bright was not the only witness to this encounter, however. Northrup claims that he put both of his hands in front of him as soon as the officer approached—with one holding the cell phone and the other holding the dog leash. R. 28 at 33–35. Only the officer claims that Northrup made a furtive movement after he put both hands in front of him. On this record, only a jury may decide whether Northrup made any such movement and whether it justified the officer's conduct.

While open-carry laws may put police officers (and some motorcyclists) in awkward situations from time to time, the Ohio legislature has decided its citizens may be entrusted with firearms on public streets. Ohio Rev. Code §§ 9.68, 2923.125. The Toledo Police Department has no authority to disregard this decision—not to mention the protections of the Fourth Amendment—by detaining every "gunman" who lawfully possesses a firearm. *See Ohioans for Concealed Carry, Inc. v. Clyde*, 896 N.E.2d 967, 976 (Ohio 2008) (holding that Ohio's statewide handgun policy preempts contrary exercises of a local government's police power). And it has long been clearly established that an officer needs evidence of criminality or dangerousness before he may detain and disarm a law-abiding citizen. We thus affirm the district court's conclusion that, after reading the factual inferences in the record in Northrup's favor, Officer Bright could not reasonably suspect that Northrup needed to be disarmed.

Officer Bright's other arguments on appeal rise and fall with his reasonable suspicion defense. If Bright had no reason to stop and frisk Northrup, he violated clearly established law in handcuffing—fully seizing—Northrup in his squad car for thirty minutes. *Smoak v. Hall*, 460 F.3d 768, 781 (6th Cir. 2006). Officer Bright, quite wisely, no longer defends the theory raised below that he had probable cause to *arrest* Northrup. And a jury, as the district court also correctly concluded, is the appropriate body to determine whether he acted with malice in seizing Northrup and thus whether he committed a state tort.

Unlike Officer Bright, Sergeant Ray is entitled to qualified immunity. "[W]here individual police officers, acting in good faith and in reliance on the reports of other officers, have a sufficient factual basis for believing that they are in compliance with the law, qualified immunity is warranted, notwithstanding the fact that an action may be illegal when viewed under

the totality of the circumstances." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007). Sergeant Ray did not arrive until after Northrup was handcuffed in the back of Officer Bright's police car. Ray was then told Bright's account of events, including of Northrup's "furtive movement" toward his gun and his failure to produce identification when initially requested. R. 26 at 63; R. 29 at 23; R. 38-2 at 3. With this information in hand, Ray contacted the Toledo Police Department detective's bureau to help determine the proper charge. A detective advised Ray to cite Northrup for failure to disclose personal information, Ohio Rev. Code § 2921.29, which Ray and Bright then did.

Northrup has a claim against Sergeant Ray only if we infer that Officer Bright, in his initial conversation apprising Ray of recent events, confessed to an illegal seizure. There is no basis in the record for such an inference. During his deposition, Northrup stated that he did not overhear the conversation between Bright and Ray, R. 28 at 38, and Northrup's wife does not mention the content of that conversation in her affidavit, R. 38-3 at 4–5. Accordingly, Ray should receive qualified immunity.

For these reasons, we affirm in part and reverse in part and remand for further proceedings.